```
                                                        USDC SDNY
UNITED STATES DISTRICT COURT                            DOCUMENT
SOUTHERN DISTRICT OF NEW YORK                           ELECTRONICALLY FILED
-------------------------------------------------------- X    DOC #: _____
                                                   :    DATE FILED: 1/25/2017
JESSY BOUSTANY,                                    :
                                                   :
                                      Plaintiff,   :          1:15-cv-10023-GHW
                                                   :
                   - v -                           :          MEMORANDUM OPINION
                                                   :              AND ORDER
XYLEM INC. and GEORGE EL HANI,                     :
Individually,                                      :
                                                   :
                                     Defendants.   :
-------------------------------------------------------- :
                                                   X
```

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

The plaintiff, Ms. Jessy Boustany, alleges that she was sexually harassed by her supervisor,

Mr. George El Hani, over the course of her twenty-six months working for Xylem, Inc. ("Xylem").

Mr. El Hani callously abused his authority, threatening Ms. Boustany's job if she did not succumb to

his sexual advances.  Nearly all of the acts that Ms. Boustany complains of took place outside of the

United States—in her, and Mr. El Hani's home country, Lebanon, or on business trips to Europe.

Ms. Boustany travelled twice on business trips to the United States with Mr. El Hani, during each of

which he made unwanted sexual advances.  Ms. Boustany complained about Mr. El Hani's behavior

to Xylem's New York headquarters, which ultimately launched an investigation, and terminated Mr.

El Hani.  Xylem also, however, later terminated Ms. Boustany.  While the conduct that Ms.

Boustany alleges is egregious, because Ms. Boustany is not a U.S. citizen, and was not employed in

the United States, she cannot maintain an action under Title VII, which has limited extraterritorial

application.  As a result, Ms. Boustany's claims against Xylem under Title VII are dismissed.  The

Court declines to retain supplemental jurisdiction over her remaining state law claims.

## II.    BACKGROUND[1]

### A.  Factual Background

Ms. Boustany is a Middle-Eastern woman, who resided in Beirut, Lebanon.  Compl. ¶¶ 6, 11.

In July 2012, she began to work for Xylem, Inc. ("Xylem"), as an application engineer.[2]  *Id.* ¶ 15.

Ms. Boustany worked in the company's Lebanon office.  *Id.* ¶¶ 44, 51.[3]  Ms. Boustany's salary was

denominated in Euro—approximately €1,264 per month, the equivalent of $1,337.15 per month.  *Id.*

¶ 16.  Xylem's corporate headquarters is located in New York.  *Id.* ¶ 5.  Ms. Boustany's supervisor at

the time that she was hired, and thereafter, was George El Hani, a Xylem employee.[4]  *Id.* ¶ 9.  Mr. El

Hani was the Managing Director of the Middle East for Xylem, and "had that [sic] ability to hire,

fire and effect [sic] the terms and conditions of Plaintiff's employment."  *Id.* ¶ 10.

Starting from the date of her interview, Mr. El Hani began a campaign of sexual harassment

against Ms. Boustany.  *Id.* ¶¶ 18-19.  Even before her first interview, Mr. El Hani commented on

Ms. Boustany's "gorgeous outfits," and shortly after she was hired, his harassment became more

overt.  *Id.* ¶¶ 20-22.  Within a month of her hiring, Mr. El Hani attempted to kiss Ms. Boustany, and

complimented her physical appearance crudely.  *Id.* ¶¶ 21-22.  Within three months, Mr. El Hani had

---

[1] Unless otherwise noted, the facts are taken from the amended complaint, and are accepted as true for the purposes of this Rule 12(b)(6) motion.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] The Court accepts this pleaded fact as true for purposes of this motion.  The Court notes that the Employment Agreement for Ms. Boustany, presented to the Court in connection with this motion, was entered into between her and Xylem Water Systems Lebanon, with a service address in Beirut, Lebanon.  Certification of George El Hani, ECF No. 29 ("El Hani Cert."), Exs. B-2 and B-3.

[3] The complaint is pleaded in an artfully reductive manner.  Aware, presumably, of the nature of the tests that an alien must satisfy in order to maintain a suit under Title VII, the complaint does not state directly Ms. Boustany's and Mr. El Hani's workplace, but it is acknowledged twice.  *See* Compl. ¶ 44 (referring to "[a]ll of the other employees in the Lebanon office"); *Id.* ¶ 51 ("While in Lebanon, [she] released EL HANI from employment . . . .").

[4] The Court also accepts this pleaded fact as true for purposes of this motion.  The Court notes that Mr. El Hani avers that he was never employed by Xylem, but, rather by one of its foreign subsidiaries, Xylem Water Systems Deutschland GmbH.  El Hani Cert. ¶ 8.

asked her to sit at his desk and work in his office, and claimed that he could not live without her.  *Id.* ¶¶ 23-24.  His treatment of her took a toll on Ms. Boustany's health; she was constantly dizzy as a result of her emotional distress.  *Id.* ¶ 25.

In October 2012, Ms. Boustany was fired because she did not accede to Mr. El Hani's sexual advances.  *Id.* ¶ 26.  But, shortly thereafter, Mr. El Hani rehired her, telling her ominously that he did so for "personal reasons."  *Id.*  At the time, Ms. Boustany "understood [Mr. El Hani's] comment to indicate that her reemployment was conditioned on acquiescing to his sexual advances."  *Id.*  Ms. Boustany began working for Xylem, and Mr. El Hani, again.

Shortly after rehiring her, in November 2012, Mr. El Hani accompanied Ms. Boustany to a training program in Austria.  *Id.* ¶ 27.  While there, he overtly propositioned her for sex, but she rejected his advances.  *Id.*  One month later, in December 2012, Mr. El Hani again accompanied Ms. Boustany on an overseas trip to Italy.  *Id.* ¶ 28.  This time, he booked a single room for both of them.  "At this time, Defendant El Hani had been making sexual advances towards her for 6 months, reminding her that her reemployment was contingent upon her acquiescence to sleep with him."  *Id.*  Mentally drained, and fearing the loss of her job, Ms. Boustany succumbed.  *Id.*

In January 2013, Mr. El Hani organized a business trip to Chicago.  *Id.* ¶ 30.  He forced Ms. Boustany to travel there with him "although she had no business in Chicago."  *Id.*  While there, Mr. El Hani summoned Ms. Boustany to his room, telling her "I am your boss and I am asking you to come to this hotel."  *Id.*  At the hotel, he again made unwanted advances toward Ms. Boustany.  *Id.* And after having sex with her, Mr. El Hani grotesquely kicked her out of his room to the hall outside, where she collapsed, only to awake the next day in her room.  *Id.*  The experience left Ms. Boustany emotionally distraught.  *Id.*  On another business trip to the United States, this time to Texas, Mr. El Hani booked a room for himself and Ms. Boustany.  *Id.* ¶ 31.  Ms. Boustany did not want to stay with Mr. El Hani, but he forced her to keep the reservation as he had made it.  *Id.*

3

Ms. Boustany complained to Mr. El Hani that his conduct was unwelcome and unwarranted, but he continued to touch her inappropriately, embarrassing and humiliating her. *Id.* ¶¶ 34-35. Mr. El Hani used Ms. Boustany's "cultural practices" to manipulate and control her, along with threats to her employment if she failed to continue as his sexual partner. *Id.* ¶¶ 32-33.

After eleven months of mistreatment following her rehiring, in September 2013, Ms. Boustany complained about Mr. El Hani's sexual harassment and discrimination to Xylem's regional director, Valerie Lassalle. *Id.* ¶ 36. Ms. Lassalle in turn reported the matter to Cornett Lewers, the chief ethics and compliance officer in Xylem's New York headquarters. *Id.* ¶ 37. Mr. Lewers contacted Ms. Boustany on November 7, 2013 and informed her that an investigation of her complaints would take place. *Id.* ¶ 38. During the investigation that followed, Mr. El Hani's treatment of Ms. Boustany "grew retaliatory and unbearable." *Id.* ¶ 39. On at least fourteen occasions between November 2013 and October 2014, Ms. Boustany complained to Ms. Lassalle, Mr. Lewers, and others about her mistreatment by Mr. El Hani, and his retaliation against her. *Id.* ¶ 40. Four times in early 2014, Ms. Boustany emailed Ms. Lassalle, Mr. Lewers, and the regional director, Vincent Chirouze, to follow up about her November 2013 complaint. *Id.* ¶ 42. The defendants failed to respond. *Id.* ¶¶ 43, 50.

In either December 2013 or January 2014, Mr. El Hani demoted Ms. Boustany, allegedly to retaliate against her. *Id.* ¶ 44. As a result of the change in position, she was now supervised by a manager based in Dubai. *Id.* Ms. Boustany does not allege further sexual harassment by Mr. El Hani following her change in supervisors, but she does allege that Mr. El Hani continued to act out against her in retaliation for her complaints: he blamed her for others' mistakes, cancelled a possible trip to Chicago by Ms. Boustany, forced her to stay at cheaper hotels than her colleagues, and even prevented her from travelling to Dubai at the request of her new supervisor. *Id.* ¶¶ 45-47, 49. Ms. Boustany felt isolated from her colleagues, who saw her as a "troublemaker." *Id.* ¶ 48.

Ms. Boustany again complained to Xylem's human resources office by email, but Xylem never responded; nor did they respond when Ms. Boustany's new supervisor raised the issue with them.  *Id.* ¶ 50.  Finally, however, in March 2014, Mr. Lewers travelled to Lebanon from his office in New York, together with Ms. Lassalle and Mr. Chirouze.  While that group was in Lebanon, they terminated Mr. El Hani.  *Id.* ¶ 51.  Ms. Boustany was promised "beautiful days and promotions" ahead.  *Id.*  But beautiful days did not arrive.  Instead, in November 2014, as a condition to a "business offer" by Xylem to Mr. El Hani, Ms. Boustany was terminated.  *Id.* ¶ 53.

### B.  Procedural Background

Ms. Boustany filed a claim with the Equal Employment Opportunity Commission ("EEOC") alleging a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.* ("Title VII"); she received a right to sue letter from the EEOC on September 30, 2015. *Id.* ¶¶ 13-14.  Boustany filed her complaint in this matter on December 23, 2015, alleging violations of Title VII by Xylem and violations of the New York State Human Rights Law, N.Y. Exec. Law § 296 *et. seq.*, by both Xylem and Mr. El Hani.  *Id.* ¶ 1.  Xylem filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on April 4, 2016.  ECF No. 26.  On the same date, El Hani filed a separate motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), (5), and (6).  ECF No. 31.

## III.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

While a complaint need not provide "detailed factual allegations," it nevertheless must assert "more than labels and conclusions" and more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The facts pleaded "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* (citations omitted). The court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the nonmoving party. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999).

## IV. DISCUSSION

### A. Applicability of Title VII to Plaintiff's Claims

Title VII prohibits various forms of employment discrimination on the basis of an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An "employee" is defined as "an individual employed by an employer." *Id.* § 2000e(f). Title VII's protections extend to American citizens working abroad. *Id.* ("With respect to employment in a foreign country, [the term 'employee'] includes an individual who is a citizen of the United States."). The statute also protects non-citizens working within the United States. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973) ("Title VII was clearly intended to apply with respect to the employment of aliens inside any State.").

However, Congress did not extend the protections of Title VII to non-citizens employed outside of the United States. The statute specifically provides that "[t]his subchapter shall not apply to an employer with respect to the employment of aliens outside any State . . . ." 42 U.S.C. § 2000e-1(a).[5] As a result, a non-citizen, such as Ms. Boustany, cannot sue under Title VII unless she is

---

[5] The statute does apply extraterritorially to United States citizens working abroad under certain circumstances. In response to the Supreme Court's decision in *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991), Congress amended the statute's definition of "employee" to extend the protections of the statute to citizens of the United States employed in a foreign country. At the same time, however, Congress limited the extraterritorial effect of the statute pursuant to 42

"employed" inside a state of the United States.  *See, e.g., Shekoyan v. Sibley Int'l*, 409 F.3d 414, 420-22 (D.C. Cir. 2005); 6 Emp. Coord. Employment Practices § 41:285 (noting that "U.S. job discrimination laws do not apply to the employment of aliens outside the United States. . . .  Title VII does not extend extraterritorially to any person who is not an American citizen."); 1 Emp. Discrim. Coord. Analysis of Federal Law § 18:26 (same).

### 1.  Employment In the United States

The location of the plaintiff's employment is a key factor in the analysis of a Title VII claim brought by an alien.  *See, e.g.*, *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 67 (D.D.C. 2002), *aff'd*, 409 F.3d 414 (D.C. Cir. 2005) ("The location of the alleged discriminatory employment of a non-citizen is critical to a Title VII analysis . . . .").  However, the statute does not define the term "employed" in this context.  Federal courts confronting this issue have developed two alternative tests to determine whether an alien was employed in the United States:  the "primary workstation" test and the "center of gravity" test.[6]  The Court expresses a number of concerns regarding the application of the "center of gravity" test in the context of litigation under Title VII by non-U.S. citizens whose primary workstation is outside of the United States in Section IV.C below.  However, the Court need not decide here whether the "primary workstation" or the "center of gravity" test is the appropriate standard, because Ms. Boustany's allegations fail under either test.

---

U.S.C. § 2000e-1 (c)(2), which provides that "Sections 2000e-2 and 2000e-3 of this title shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer."

[6] The Second Circuit has not specifically endorsed either of the two tests in this context.  However, in *Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, the Second Circuit did expressly agree with the application of the "primary workstation" test in the context of litigation under 42 U.S.C. § 1981(a).  460 F.3d 296, 304 (2d Cir. 2006) ("We agree with those courts that have held 'that an individual, whose primary workstation is abroad, cannot characterize otherwise extraterritorial employment as domestic solely because employment decisions were made . . . in the United States.'") (citations omitted).  In the same case, the Second Circuit declined to "adopt 'a center of gravity test' or engage in a 'balancing of contacts' analysis that would introduce much uncertainty into the law." *Id.* at 305.

### a.   The "Primary Workstation" Test

A significant number of courts have adopted a "primary workstation" test to evaluate whether an alien is employed within the United States.  While the test has been in use for some time, perhaps the leading case applying this standard is *Shekoyan v. Sibley Int'l Corp.*, 217 F.Supp.2d 59, 68 (D.D.C. 2002), *aff'd*, 409 F.3d 414 (D.C. Cir. 2005).  In *Shekoyan*, the plaintiff, Mr. Shekoyan, was hired to work in the Republic of Georgia but was "hired by, trained at, and reported to the defendant's corporate headquarters" in Washington, D.C.  *Id.* at 62.  Mr. Shekoyan was later terminated and consequently brought suit under Title VII, alleging that he had been discriminated against on the basis of his national origin.  The court was required to evaluate whether Mr. Shekoyan was employed in the United States or abroad.

The court held that an employee's place of employment was to be determined based on "the location of the employee's primary workstation."  *Id.* at 68.  Although Shekoyan's position did have some connection to the United States, the court held that his "primary workstation and thus his place of employment" was located in the Republic of Georgia because he was "specifically hired by the defendant to work in the Republic of Georgia and performed his primary work related duties there."  *Id.*  Consequently, Title VII did not apply.  *Id.* at 68-69.  On appeal, the D.C. Circuit affirmed the District Court's conclusion.  *Shekoyan*, 409 F.3d at 422.

A number of other courts have applied the primary work station test or a close cognate of it. *See, e.g., Herrera v. NBS, Inc.*, 759 F. Supp. 2d 858, 866 (W.D. Tex. 2010) (holding that individual who was hired in, supervised from, provided a furnished office in, given business cards with a local phone number from, attended weekly meetings in, and spent half of his work week in El Paso, Texas had a "primary workstation" in Texas); *E.E.O.C. v. Int'l Profit Assocs., Inc.*, 647 F. Supp. 2d 951, 994 (N.D. Ill. 2009); *Denty v. SmithKline Beecham Corp.*, 907 F. Supp. 879, 884 (E.D. Pa. 1995), *aff'd*, 109 F.3d 147 (3d Cir. 1997) (holding that an employee was not covered by the ADEA because his

"work station was outside the United States"); *Gantchar v. United Airlines, Inc.*, No. 93 C 1457, 1995 WL 137053, at *10 (N.D. Ill. March 28, 1995) (holding that foreign flight attendant, who spent approximately 20% of her time working in the United States, was not employed in the United States). Some commentators present the "primary workstation" test as the only relevant test. *See, e.g.*, 6 Emp. Coord. Employment Practices § 41:285 ("A determination of a plaintiff's location of employment for Title VII purposes focuses on the location of the employee's primary workstation."); 1 Emp. Discrim. Coord. Analysis of Federal Law § 18:26 ("A determination of a plaintiff's location of employment for Title VII purposes focuses on the location of the employee's primary workstation."). Unfortunately, none of these authorities specifically define what constitutes a "primary workstation," but, as applied, courts focus on the percentage of time spent in a particular location, among other factors, to assess whether it is the employee's "primary workstation."

The complaint does not plausibly allege that Ms. Boustany's "primary workstation" was within the United States. The complaint alleges that during the course of Ms. Boustany's over two years working for Xylem, she worked in the United States only during her two business trips to Chicago and Texas. Compl. ¶¶ 30-31. And, as noted above, Ms. Boustany had no business to conduct in Chicago during her business trip there. These two business trips to the United States cannot plausibly make any state within the United States Ms. Boustany's primary workstation. Indeed, in her opposition to the plaintiff's motion to dismiss, Ms. Boustany does not contend that her allegations satisfy the "primary workstation" test, relying instead exclusively on arguments tailored to the alternative "center of gravity" test. *See* Plaintiff's Memorandum of Law in Opposition, ECF No. 32 ("Pl. Opp.") at 4-8.

### b. "Center of Gravity" Test

The "center of gravity" test was first articulated in *Torrico v. Int'l Bus. Machines Corp.* 213 F. Supp. 2d 390, 403 (S.D.N.Y. 2002). The plaintiff in *Torrico* was a Chilean national who worked for

many years for IBM in New York. *Id.* at 393. He was placed on a "temporary" assignment in IBM's offices in Chile. *Id.* The temporary assignment lasted several years. *Id.* Throughout that entire period, the plaintiff remained on IBM's payroll in New York. *Id.* at 394. He remained on the company's U.S. salary and benefits plans, and New York and federal taxes were withheld from his paycheck. *Id.* After the plaintiff developed a serious disability, he was terminated at a time when he was still living in Chile. *Id.* at 395. He brought suit against IBM under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, and a number of other statutes.

In its opinion, the *Torrico* court recognized the limitations on the extraterritorial effect of the ADA. The court observed that in the 1991 amendments to the ADA, Congress had expressed an intent to extend the protections of the ADA to U.S. citizens working abroad for U.S.-controlled companies. *Torrico*, 213 F. Supp. 2d at 397. Referring to the 1991 amendments to both the ADA and Title VII, the court wrote that "it is clear that both sets of amendments distinguish between U.S. citizens working abroad for U.S. employers, who are protected from discrimination, and non-U.S. citizens working abroad for those same employers, who fall outside the statutory protections against discrimination." *Id.* at 399. Since the plaintiff in *Torrico* was an alien, the question presented was whether he was employed in the United States, because, if not, he could not recover.

It should be noted that the ADA does not appear to contain a cognate to Title VII's express exclusion of coverage "with respect to the employment of aliens outside any State" under 42 U.S.C. § 2000e-1(a). That section of Title VII existed prior to the 1991 Civil Rights Act, and was not grafted into the ADA pursuant to that statute. As a result, the court in *Torrico* did not analyze whether the claim was "with respect to" the alien's employment "outside any State," which is the relevant test in this Title VII action. Instead, *Torrico* evaluated whether an alien was employed in the United States using a different textual framework.

The *Torrico* court approached the question through the lens of the ADA's definition of "employee," which, like the equivalent definition in Title VII, states that "[w]ith respect to employment in a foreign country, such term includes an individual who is a citizen of the United States." 42 U.S.C. § 12111(4).[7] The court concluded on the basis of its review of the statutory text that if an alien's claim was "with respect to employment in a foreign country," it was not with respect to employment in the United States. *Torrico*, 213 F. Supp. 2d at 400 ("Torrico's second argument, however, raises a legitimate question concerning the circumstances in which an employer's acts of discrimination on the basis of disability should be characterized as taking place 'with respect to employment in a foreign country,' rather than with respect to employment in the United States."). The court then set about establishing a test to evaluate that question.

The *Torrico* court first rejected the series of precedents that had adopted the "primary workstation" and similar tests. The court opined that those cases "present simpler factual scenarios distinguishable from the present case, and perhaps for that reason, oversimplify the analysis of what constitutes 'employment in a foreign country.'" *Id.* at 401.[8] The *Torrico* court then observed that many of the precedents applying a "primary workstation"-like test

---

[7] Some elements of the decision in *Torrico* could be construed to suggest that the definition of "employee" in the ADA has a direct impact on the right of aliens to sue under the statute. *Torrico*, 213 F. Supp. 2d at 400 ("[T]he text of the statute is clear in providing that whether [a non-U.S. citizen] employee is protected by the ADA turns instead on whether the employee asserts a claim 'with respect to employment in a foreign country.' 42 U.S.C. § 12111(4)."). The Court questions whether this conclusion is so clearly supported by the text of the statute. The definitional provision in 42 U.S.C. § 12111(4) does clearly establish that a U.S. citizen is an employee "with respect to employment in a foreign country," but it says nothing expressly about the rights of aliens. The title of section 109 of the Civil Rights Act of 1991 that adopted that definition was "Protection of Extraterritorial Employment" for U.S. citizens. Pub.L. 102–166, 105 Stat. 1071 (1991) (codified at 42 U.S.C. §§ 2000e–1(c), 12111(4), & 12112(c)). It overruled the Supreme Court's decision in *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991) in order to protect the rights of U.S. citizens. The Court agrees with *Torrico's* holding that a non-citizen cannot sue under the ADA if they were not employed within the United States, and understands the logical decision by the court in *Torrico* to define what did not constitute employment in the United States by reference to the "with respect to employment in a foreign country" language contained in the statute's definition of "employee." It is not so clear to the Court, however, that the text of 42 U.S.C. § 12111(4) defines in a direct manner the rights of aliens, as opposed to the rights of United States citizens. The Court understands, instead, that *Torrico* used the words describing "employment in a foreign country" as a logical yin to the yang of employment in the United States.

[8] In so doing, the *Torrico* court did not observe that the referenced precedents brought pursuant to Title VII did not examine what constituted "employment in a foreign country," because those decisions, instead, properly focused on

> involve situations in which employment in the United States was never
> contemplated.  Regardless of whether they were U.S. residents at the time that they
> sought employment or were hired, the non-U.S. citizen plaintiffs in those cases either
> sought employment or were hired to work exclusively (or almost exclusively) in
> foreign workplaces, without ever having first worked in the United States.
> Moreover, in each of these cases the overseas employment was intended to be
> permanent. . . .  None of these cases involve temporary, fixed-term assignments
> from an existing, U.S.-based position like the Temporary Assignment at issue in this
> case.

*Id.* at 401-02 (internal citations omitted).  It is worthy of note that the situation in this case—a non-

U.S. citizen hired to work permanently almost exclusively in a foreign country—is much like those

distinguished by Judge Lynch in *Torrico*, as not requiring the application of a standard more flexible

than the "primary workstation" test.

Dissatisfied by previously established precedent, the *Torrico* court looked to general

employment law for guidance.  The court reasoned as follows:  "Were Torrico to have asserted a

common law claim for breach of an employment contract with IBM, application of New York's

choice of law rules . . . might well require this Court to apply New York law—not Chilean law—to

adjudicate that claim, if it were found that the 'center of gravity' of Torrico's employment

relationship with IBM was in New York."  *Id.* at 403.  Without citing specific authority, but referring

generally to New York state choice of law principles, the *Torrico* court then articulated a new test to

apply to the assessment of whether an alien is employed in a foreign country for purposes of the

federal statute.

The resulting the multi-faceted "center of gravity" test was described in *Torrico* by Judge

Lynch as follows:

> Similarly, it is the "center of gravity" of the entire employment relationship between
> the plaintiff and the defendant employer, rather than one or more particular
> locations where employment duties may have been performed, that answers the
> factual question of whether an individual is "employ[ed] in a foreign country" or in

---

whether the claim was "with respect to the employment of aliens outside any State"—the exclusionary language
provided by 42 U.S.C. § 2000e-1(a).

the United States within the meaning of the ADA.  The center of gravity of an individual's relationship with an employer is determined by considering a variety of factors, including (but not limited to) whether any employment relationship had, in fact, been created at the time of the alleged discrimination, and if so, where that employment relationship was created and the terms of employment were negotiated; the intent of the parties concerning the place of employment; the actual or contemplated duties, benefits, and reporting relationships for the position at issue; the particular locations in which the plaintiff performed those employment duties and received those benefits; the relative duration of the employee's assignments in various locations; the parties' domiciles; and the place where the allegedly discriminatory conduct took place.  The list is not meant to be exhaustive; the center of gravity of the parties' relationship is to be determined based on the totality of circumstances.

*Id.* at 403-04.

The "center of gravity" test formulated in *Torrico* has since been adopted by several courts in other districts.  *See, e.g.*, *Rabe v. United Airlines, Inc.*, No. 08 C 6012, 2009 WL 2498076, at *5–7 (N.D. Ill. Aug. 14, 2009), *rev'd on other grounds Rabe v. United Air Lines, Inc.*, 636 F.3d 866 (7th Cir. 2011) (adopting "more comprehensive" center of gravity test, after concluding that the primary work station test is "vague and overly simplistic," in particular given "the nature of our global economy with its mobile workforce"); *Bakeer v. Nippon Cargo Airlines, Co., Ltd.*, 2011 WL 3625103 at *31 (E.D.N.Y. 2011); *Gomez v. Honeywell Int'l, Inc.*, 510 F. Supp. 2d 417, 423 (W.D. Tex. 2007) (criticizing "primary workstation" test as "vague and overly simplistic" and adopting the "more comprehensive" center of gravity test); *Rodriguez v. Filtertek, Inc.*, 518 F. Supp. 2d 845, 851 (W.D. Tex. 2007) (same).

Even the more comprehensive "center of gravity" test, however, does not sustain Ms. Boustany's claims.  Ms. Boustany pleads that she was and is a resident of Lebanon.  She claims that she was an employee of Xylem, but that she was paid in Euro and reported to the managing director for the Middle East, Mr. El Hani, who was also a resident and national of Lebanon.  She and Mr. El Hani worked in an office in Lebanon, where most of the abusive acts occurred, and where Mr. El Hani took advantage of Ms. Boustany's "cultural practices" to permit his conduct.  She was hired by

Mr. El Hani, not by any manager in the United States.  Throughout her tenure, Ms. Boustany reported to either Mr. El Hani in Lebanon, or later, to her supervisor in Dubai; she does not allege that her work was supervised or managed by anyone in the United States.

Ms. Boustany does not plead that any of her work took place inside of, or related to, the United States except for the two business trips to the United States.  During one of those two business trips, Ms. Boustany acknowledges, she had no business to conduct.  The complaint does not allege the precise duration of each of those two trips, but put in the context of approximately twenty-six months of employment at Xylem, the court does not find that they support a conclusion that the United States was the center of gravity for her employment.  Put simply, two business trips by an alien to the United States do not support the conclusion that the alien is employed in the United States.  If it did, many employers of foreign nationals around the globe would find themselves unexpectedly subject to United States anti-discrimination laws.

Ms. Boustany seems to acknowledge in her opposition that the trips to the United States alone are insufficient to support her claim, arguing that her claims that she was employed in the United States are bolstered by the facts that "Plaintiff made several complaints to the New York office, the investigations into her discrimination and retaliation complaints and the decision to terminate her were all conducted in the New York office."  Pl. Opp. at 8.  However, these are not facts that weigh heavily, if at all, in an evaluation of whether Ms. Boustany was *employed* in any state, under even the "center of gravity" test.  The decision to terminate may be a significant event for a discrimination claim, but it says little about where Ms. Boustany was employed during the time of her work for the company, which is the focus of the inquiry.  Note that the place of termination was not among the many, if non-exclusive, factors articulated in *Torrico*.

The same is true regarding the claims of retaliation in this case, nearly all of which involve retaliation by Mr. El Hani in the Lebanon office.  While Ms. Boustany alleges that she complained of

the retaliation to Xylem's New York office, her assertion is that the office did not respond to the complaints.  Compl. ¶ 50.  This alleged failure by the New York office to respond to complaints by an employee abroad does not lend weight to the conclusion that she was employed in the United States.  Nor does the fact that Ms. Boustany's allegations of abuse were investigated in New York support the conclusion that she was employed in New York.

### B.  State Law Claims

Under 28 U.S.C. § 1367(c)(3), the exercise of supplemental jurisdiction over Plaintiff's remaining state law claims is within the Court's discretion if it has "dismissed all claims over which it has original jurisdiction."  The Second Circuit counsels against exercising supplemental jurisdiction in such a situation: "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991)).

Having dismissed all of Plaintiff's claims that were based on a federal question under 28 U.S.C. § 1331, and there being no other basis for federal jurisdiction over this case, the Court declines to exercise its supplemental jurisdiction over Plaintiff's remaining state law claims.  See 28 U.S.C. § 1367(c)(3).  Accordingly, those claims are dismissed without prejudice.

### C.  Leave to Amend

In this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  As the Second Circuit has instructed, "[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)).  In

the absence of such reasons, whether "'apparent or declared,'" leave to amend should be granted. *Abbatiello v. Monsanto Co.*, 571 F. Supp. 2d 548, 552 (S.D.N.Y. 2008) (quoting *Forman*, 371 U.S. at 182). Recognizing these guiding principles, the Court nonetheless denies Plaintiff leave to amend the complaint. For the reasons described below, it appears beyond doubt that Ms. Boustany can plead no set of facts that will resuscitate her Title VII claims.

Ms. Boustany's pleading suggests no factual basis on which the Court might ever conclude that her "primary workstation" was in the United States. She visited the United States twice in the course of over two years of employment. Even under the more lenient "center of gravity" test, the Court does not believe that Ms. Boustany can plead that she was employed within the United States. She was hired to work outside of the United States, and worked there throughout her tenure other than two business trips to the United States; her supervisors were located outside of the United States; and nearly all of the discriminatory acts occurred outside of this country. Ms. Boustany's case presents the kind of circumstances which the *Torrico* court stated could be adequately assessed by the "primary workstation" test. The "center of gravity" test was not designed to reach a different conclusion in circumstances like those presented by Ms. Boustany.

Moreover, the Court expresses concern regarding the application of the "center of gravity" test articulated in *Torrico* to cases brought by aliens under Title VII. As the Court observed above, the "center of gravity" test was not based on an analysis of the clear exclusionary language in Title VII. The rationale presented by the *Torrico* court to develop a standard based on New York conflict of law principles to determine the extraterritorial application of a federal statute was a musing hypothetical presented in a single sentence.[9]

---

[9] "Were Torrico to have asserted a common law claim for breach of an employment contract with IBM, application of New York's choice of law rules . . . might well require this Court to apply New York law—not Chilean law—to adjudicate that claim, if it were found that the 'center of gravity' of Torrico's employment relationship with IBM was in New York." *Torrico*, 213 F. Supp. 2d at 403.

Most importantly, the Court has concerns regarding the use of an imprecise, multi-faceted, fact-intensive balancing test to extend the protections of Title VII outside of the United States.  In Title VII, Congress clearly stated that non-U.S. citizens should not be able to avail themselves of the protections of the statute if they were employed outside of any state.  42 U.S.C. § 2000e-1(a).  The selection of a test to evaluate when a non-U.S. citizen is employed in the United State should take into account that express mandate.  It should also consider the general presumption against extraterritorial application of United States statutes.  *See, e.g.*, *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (presumption against extraterritorial application applies to all statutes and can only be overcome by affirmative intention of foreign effect by Congress).  It is not clear that the "center of gravity" test adequately respects those principles.

The "center of gravity" test requires a fact-intensive analysis of the "totality of the circumstances."  *Torrico*, 213 F. Supp. 2d at 404.  As a result, it is significantly less predictable than the admittedly simpler "primary workstation" test, and creates more uncertainty regarding the extraterritorial application of U.S. law.  *See* Michelle Shender, *Claims by Non-Citizens Under the Americans with Disabilities Act:  Proper Extraterritorial Application in* Torrico v. International Business Machines?, 17 PACE INT'L L. REV. 131, 155-56 (2005).  The Second Circuit acknowledged that concern in *Ofori-Tenkorang* when, in the context of an action brought under § 1981, it declined to "adopt 'a center of gravity test' or engage in a 'balancing of contacts' analysis that would introduce much uncertainty into the law."  *Ofori-Tenkorang*, 460 F.3d at 305.  An open-ended balancing test based on the "totality of the circumstances" may make early, pre-discovery disposition of such claims more difficult—effectively expanding the universe of claims brought in federal court by non-U.S. citizens who do not work primarily in the United States, and, thereby, effectively extend the extraterritorial reach of the statute.

The Court recognizes that the "center of gravity" test is, as several courts that have adopted it have stated, "more comprehensive" than the "primary workstation" test. But the question presented by the adoption of the "center of gravity" test is whether an alien whose primary workstation is not in the United States should be able to sue under Title VII in U.S. federal court regarding workplace discrimination. In that context—in recognition of concerns regarding the extraterritorial application of U.S. law and in furtherance of the predictable application of U.S. law— it may be that, as Mies Van Der Rohe famously commented, "less is more."

## V.    CONCLUSION

The Court empathizes with Ms. Boustany's alleged sufferings, however the protections of Title VII do not apply to non-U.S. citizens employed outside of the United States. Ms. Boustany does not plausibly allege that she was employed in the United States. Consequently, Ms. Boustany's claims against Xylem under Title VII are dismissed with prejudice. The Court declines supplemental jurisdiction over her state law claims.

The Clerk of Court is directed to terminate all pending motions and to close this case.

SO ORDERED.

Dated:  January 25, 2016
New York, New York

_____
GREGORY H. WOODS
United States District Judge